# UNITED STATES DISTRICT COURT

### for the
Eastern District of Missouri

<table>
<tr><td><b>In the Matter of the Search of</b><br>The storage locker "B24" at the Public Storage located at 6030 North Lindbergh Blvd., Hazelwood, MO 63030 ("<b>Target Location #1</b>").  <b>Target Location #1</b> has an orange garage type door that opens and closes vertically. The numbers "24" are affixed on the door frame to the right side of the door in black.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No. 4:20 MJ 5071 (NAB)<br><br>SUBMITTED TO THE COURT AND<br>SIGNED BY RELIABLE ELECTRONIC MEANS</td></tr>
</table>

**FILED**

MAR 24 2020

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

## APPLICATION FOR A SEARCH WARRANT

I, ___JASON DIETL___, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property: **the storage locker "B24" at the Public Storage located at 6030 North Lindbergh Blvd., Hazelwood, MO 63030 (("Target Location #1") as fully described above,**

located in the _____EASTERN_____ District of _____MISSOURI_____, there is now concealed

SEE ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
  ✓ evidence of a crime;
  ✓ contraband, fruits of crime, or other items illegally possessed;
  ✓ property designed for use, intended for use, or used in committing a crime;
  ❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, U.S.C., §§ 846, 841(a)(1) | Conspiracy to possess with intent to distribute controlled substance(s) |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

  ✓ Continued on the attached sheet.
  ❑ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
JASON DIETL, Task Force Officer
Drug Enforcement Administration
*Printed name and title*

**Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.**

Date: ___March 24, 2020_____

_____
*Judge's signature*

City and State: ___St. Louis, MO_____

Nannette A. Baker,  U.S. Magistrate Judge
*Printed name and title*

AUSA:  STEPHEN CASEY

**AFFIDAVIT IN SUPPORT OF APPLICATION**
**FOR SEARCH AND SEIZURE WARRANTS**

I, Jason Dietl , being duly sworn, depose and state:

**INTRODUCTION**

1.       I am a Task Force Officer with the Drug Enforcement Administration (DEA) and have been since August 2018. During my law enforcement career, I have participated in numerous investigations involving the possession, manufacture and distribution of controlled substances. Those investigations have included the use of surveillance of persons involved in the possession and distribution of controlled substances, and the execution of arrest and search warrants for persons and places connected with the possession, manufacture and distribution of controlled substances. My specialized training has included, but is not limited to investigation of the manufacture, possession and distribution of controlled substance listed within the Controlled Substance Act, executing search and arrest warrants involving drug offenses, gathering drug and non-drug evidence, under cover assignments, supervision and utilization of informants, narcotic smuggling, and money laundering.

2.       The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

**LOCATIONS TO BE SEARCHED**

3.       I make this affidavit in support of an application for search warrants for the properties listed below and the seizure of the items specified in Attachment B, which items constitute instrumentalities, fruits, and evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846; and Title 18, United States Code, Section 1956.

1

4.     The properties to be searched are described as:

a.  the storage locker "B024" at the Public Storage located at 6030 North Lindbergh Blvd., Hazelwood, MO 63030 ("**Target Location #1**").  **Target Location #1** has an orange garage type door that opens and closes vertically.  The numbers "24" are affixed on the door frame to the right side of the door in black.

b.  the storage locker "D111" at the Public Storage located at 1539 South Old Highway 94, St. Charles, MO 63303 ("**Target Location #2**").  **Target Location #2** has a white door that opens and closes horizontally.  The numbers "111" are affixed over the door frame of the **Target Location #2** in black color.

5.     **Target Location #1** is believed to be a "stash location" for the Ali WILSON DTO. A "stash location" can be described as a structure utilized by drug dealers to store and sell narcotics, weapons and/or U.S. currency.  Investigators made contact with the on-duty property manager of Public Storage and provided him/her with an administrative subpoena.  The on-duty manager stated an individual named Michael BROWN is renting **Target Location #1**.  Through physical surveillance and confidential source information, investigators have identified Michael Brown to be a facilitator for the WILSON DTO.

6.     During the course of the investigation into the WILSON DTO, investigators obtained court authorized Precision Location Information warrants ("PLW"), vehicle Global Positioning System (GPS) and Title III warrants for cellular devices and a vehicle utilized by Ali WILSON.  GPS and PLW information have placed Ali WILSON's vehicle and cellular devices at **Target Location #1** as described below.

7.     **Target Location #2** is also believed to be a "stash location" for the WILSON DTO. Investigators made contact with the on-duty property manager of the Public Storage and provided

him/her with an administrative subpoena. The on-duty manager stated Erika HOUSTON is renting **Target Location #2**. Through phone toll analysis and confidential source information, investigators have identified Erika HOUSTON to be a facilitator for the WILSON DTO.

**PROBABLE CAUSE**

<u>**Background on the Investigation**</u>

8.     In December of 2018, the St. Louis Drug Enforcement Administration initiated an investigation into the distribution of heroin/fentanyl, crystal methamphetamine, cocaine, and marijuana by individuals associated with the WILSON DTO. Investigators have identified multiple subjects within the WILSON DTO to include Yusef and Ali WILSON, Earl WRIGHT, and Marvell REYNOLDS. Investigators have arrested multiple subjects affiliated with the WILSON DTO and seized both narcotics and U.S. currency during the course of the investigation.

9.     On April 22, 2019, DEA Amarillo and the Texas Department of Public Safety interdicted a shipment of approximately 1.2 kilograms of heroin, 77 pounds of methamphetamine and a stolen firearm transported in a red Kia sedan driven by Norberto FERNANDEZ-HERNANDEZ. FERNANDEZ-HERNANDEZ cooperated with investigators and provided a Mirandized statement advising that the heroin and methamphetamine was destined for St. Louis, Missouri. FERNANDEZ-HERNANDEZ stated he previously transported a load of narcotics to St. Louis, Missouri towards the end of March or beginning of April 2019. Upon arriving in St. Louis with the load, FERNANDEZ-HERNANDEZ stated he delivered it to two black male subjects. One subject was very well dressed, had a shaved head and full, black beard. When FERNANDEZ-HERNANDEZ made eye contact with this subject, the subject yelled at him and instructed FERNANDEZ-HERNANDEZ not to look at him. Based on this description,

3

investigators provided FERNANDEZ-HERNANDEZ with a picture of Ali WILSON, to which FERNANDEZ-HERNANDEZ confirmed that this was the subject that yelled at him.

10.     On July 25, 2019, St. Louis DEA received information from DEA Baltimore that a Mexican source of supply (SOS) had boarded a flight destined for St. Louis. St. Louis investigators established surveillance of the SOS when he arrived in St. Louis and observed him travel to the Doubletree Hotel in Maryland Heights, Missouri. Investigators observed the SOS meet with other Hispanic males and followed them to a warehouse on Welsch Industrial Court in Maryland Heights, Missouri. Investigators witnessed the males unload three large white parcels into the warehouse. Investigators followed the SOS to the airport and confirmed his departure while other investigators maintained surveillance on the other Hispanic males.

11.     On July 27, 2019, investigators observed one of the Hispanic males enter the warehouse and exit a short time later carrying a large backpack and two medium sized boxes. The Hispanic male utilized an Uber to travel to a nearby Red Roof Inn (in Maryland Heights, Missouri) and enter room #239. At approximately 12:04 PM, investigators observed a black colored GMC Denali pickup truck, bearing Missouri license plate 9UX-297 arrive near room #239. The vehicle was registered to Ali WILSON. Investigators observed a younger Hispanic male exit WILSON's vehicle and enter room #239 carrying a medium sized black colored gym bag and a medium sized purple colored gym bag. Moments later, investigators observed the same Hispanic male exit room #239 carrying the same back pack and two boxes they observed the Hispanic male remove from the warehouse. Based on the investigators training and experience, investigators believed they had just witnessed a narcotic transaction.

12.     Investigators utilized a St. Louis County Police Officer to conduct a traffic stop of WILSON's vehicle upon its departure from the Red Roof Inn. When stopped, the Officer

4

identified Ali WILSON as the driver of the vehicle when WILSON provided his driver's license to the Officer. When the Officer asked WILSON to step out of the vehicle, WILSON fled the traffic stop at a high rate of speed and evaded law enforcement. Investigators believe WILSON fled the traffic stop because his vehicle contained a large amount of drugs.

13.     Meanwhile, investigators maintained surveillance on the Hispanic male from the Red Roof Inn and observed him later carry the black and purple gym bags (delivered by WILSON and the unknown male) into the warehouse. On August 1, 2019, investigators observed the Hispanic male depart the warehouse carrying three large boxes and one small box. Investigators observed the Hispanic male travel to a Fed Ex facility (at 800 North Ballas Road, St. Louis, Missouri 63141) and carry the three boxes into the facility. El Paso DEA later interdicted the packages and located $553,670 in the packages contained within hollowed out gas meters. Based on the seizure, investigators believe the younger Hispanic male that exited WILSON's vehicle to enter the Red Roof Inn room #239 exchanged a large sum of U.S. currency for the drugs that were believed to be in WILSON's vehicle.

**Michael BROWN and Ali WILSON Seen Together**

14.     On August 15, 2019, investigators conducted surveillance on Ali WILSON. Investigators monitored court authorized PLW data on WILSON's cellular device to discover WILSON's phone in the Ellisville, Missouri area on, or near, Manchester Rd. Investigators responded to the area and located a Nissan Altima parked at Arby's (15676 Manchester Rd., Ellisville, Missouri 63011). Investigators ran the vehicle's registration through a law enforcement database to discover the vehicle was registered to WILSON. Investigators commenced surveillance on the vehicle. Investigators then observed two black male subjects exit the Arby's,

identified as WILSON and a subject later identified as Michael BROWN, and drive away in the Nissan Altima.

15.     Investigators sent a confidential source ("CS")[1] the photograph of BROWN in an attempt to further identify BROWN's relationship with WILSON. The CS identified the subject as "Light Skin" and knew the subject as the driver/security for the WILSON. WILSON and BROWN were then observed traveling to two other stores in the St. Louis area. After following WILSON and BROWN from the last store, investigators terminated surveillance due to WILSON conducting evasive and counter surveillance measures.

**Identification of Target Location #1**

16.     On August 21, 2019, investigators monitored court authorized GPS information of a 2016 GMC Sierra known to be utilized by Ali WILSON, as well as the PLW information of a cellular device subscribed to and utilized by Ali WILSON.

17.     Investigators observed the GMC Sierra arrived at the Public Storage business parking lot located at 6030 North Lindbergh Boulevard, Hazelwood, MO (where **Target Location #1** is located) and parked in a parking spot on the far north side of the business. It should be noted the accuracy diameter was within 12 meters of the vehicle's shown location, confirming the vehicle was indeed in the parking lot of the Public Storage. The PLW data also placed WILSON's cellular telephone near the location of the Public Storage.

18.     WILSON remained at the Public Storage until he departed at approximately 11:36 am. WILSON then travelled directly to the Regions Bank, located at 11920 New Halls Ferry Road, St. Louis, MO. Investigators later subpoenaed Regions Bank to discover that WILSON

---

[1] The CS is a paid informant and a former Source of Supply to the WILSON DTO. The CS information has been proven reliable and has been independently corroborated by investigators. The CS has provided information to investigators that has led to multiple arrests of and seizures from multiple WILSON DTO members.

6

deposited $1,000 in cash, as well as two cashier's checks valued at a $550. WILSON then travelled to Vantage Credit Union, located at 11654 West Florissant Avenue, Florissant, MO. Investigators later subpoenaed Vantage Credit Union to discover that WILSON made a cash deposit of $2,000. After departing Vantage Credit Union, WILSON stopped after various building supply stores and several check cashing locations. Based on a review of WILSON's subpoenaed banking records, investigators believe that WILSON only deposits enough cash into the bank to pay bills that must be paid through a bank account. Investigators also note that a public records check revealed that WILSON did not receive any employment income during this time period.

**Link Between Erica HOUSTON and the WILSON DTO**

19.     On February 19, 2020, investigators learned that Ali WILSON, Earl WRIGHT, Erica HOUSTON, and Boyd HOUSTON had booked flights to travel to Panama City, Panama on February 20, 2020 from St. Louis-Lambert International Airport. Investigators made contact with Panama DEA Special Agent Kevin DeStefano regarding assisting with identifications and possible surveillance in Panama. SA DeStefano originally advised the country of Panama may not let anyone with a criminal history past Customs. SA DeStefano eventually confirmed that they were only able to identify WILSON and Earl WRIGHT entered past Customs. Agents were able to surveil WILSON and Earl WRIGHT to the W Hotel where they may have met with several other unknown male subjects. WILSON and Earl WRIGHT returned on February 24, 2020.

20.     On March 6, 2020, a reliable source of information (SOI)[2] contacted investigators and informed them Boyd HOUSTON traveled to Panama City, Panama and met with WILSON and Earl WRIGHT. The SOI informed investigators that he/she was told by Erica HOUSTON,

---

[2] The Source of Information (SOI) is a long –term customer of Erica HOUSTON's barbershop. THE SOI is not working off current charges nor is being compensated for information provided. Additionally, the information provided by the SOI has been independently corroborated by investigators.

the sister of Boyd HOUSTON that Boyd HOUSTON did travel to Panama and was shown videos of Boyd HOUSTON while he was there.

21.     On March 18, 2020, investigators spoke with the SOI and was informed that Erica HOUSTON identified the subjects that went to Panama as Loretta HOUSTON, Boyd HOUSTON, Earl WRIGHT, an unknown Panamanian male, and WILSON. Erica HOUSTON told the SOI they went on this "vacation" to visit an unknown Panamanian male drug source with whom Boyd HOUSTON was in prison.

**Seizure of Approximately 25 Kilograms of Cocaine from Ali WILSON**

22.     On January 8, 2020, Task Force Officer (TFO) Dave Weissenborn observed WILSON DTO member Earl WRIGHT operating his Honda Odyssey, bearing Illinois license plate BM54711. TFO Weissenborn was familiar with WRIGHT operating this vehicle as he has conducted surveillance on WRIGHT on multiple occasions prior to this date. TFO Weissenborn followed WRIGHT to 3315 Kingsley Drive, Florissant, Missouri and observed him back the vehicle into the drive way. WRIGHT exited the vehicle and began speaking with a heavy set black male subject later identified as Marvell REYNOLDS. Investigators were previously unfamiliar with this address, and REYNOLDS, being associated with the WILSON DTO.

23.     The utilities at the residence were in the name of Marvell REYNOLDS and a Department of Revenue (DOR) photo confirmed the identification of REYNOLDS. Cellular phone toll records show REYNOLDS in contact with Boyd HOUSTON. HOUSTON has been federally convicted on a cocaine distribution charge where he was sentenced on July 3, 2007 to twelve years in prison and five years of supervised release. Cellular phone tolls show HOUSTON in contact with Earl WRIGHT. Cellular phone toll records also show HOUSTON in occasional contact with both Yusuf and Ali WILSON.

8

24.     On February 12, 2020, TFO Weissenborn checked electronic surveillance of the Kingsley residence and observed a light colored SUV parked in the driveway. Investigators had never observed this vehicle and responded to the area to establish a physical surveillance of 3315 Kingsley Drive. The vehicle was identified as silver colored 2006 Jeep Cherokee, bearing Texas license plate LXZ 2572. The vehicle was registered to Brandi Monique POE-WATERS at 7887 Wade Blvd, Apt 4314, Frisco, TX 75034. The previous owner was identified as Ashley WRIGHT Jr.. Per the Missouri Department of Revenue, the vehicle registration transfer date to POE-WATERS appeared on May 15, 2019. A criminal history check on WRIGHT revealed the following arrests/convictions: Money Laundering greater than $300,000 (May 2018—convicted of class a misdemeanor in the 9th District Court in Texas), misdemeanor theft, and possession under 30 grams.

25.     Upon further research, investigators discovered that Ashley WRIGHT was found to be in possession of approximately $448,000 in U.S. currency in Conroe, Texas. It should be noted that Yusuf WILSON resides in Conroe, Texas. Further, during questioning, Ashley WRIGHT informed officers that he was travelling to Texas from St. Louis, Missouri. Investigators did not find any criminal history for POE-WATERS.

26.     Investigators obtained a public records and a historical License Plate Reader report which indicated the 2006 Jeep Grand Cherokee appeared to travel from Houston, Texas to St. Louis, Missouri approximately every thirty days.

27.     On February 17, February 24 and March 9, of 2020, investigators conducted a series of "trash pulls" from the 3315 Kingsley Drive. During the trash pulls, investigators located multiple items, to include several receipts with large cash purchases, plastic baggies that had the corners removed, multiple shipping labels from the United States Postal Service and multiple

9

gallon sized vacuum sealed bags that appeared to have the shape of brick indented within. Based on training and experience and the experience of the investigative team, investigators believe that it is common for narcotics traffickers to utilize gallon sized vacuum seal bags to conceal narcotics when shipping in an effort to thwart their detection from drug sniffing canines. Additionally, investigators believe that it is common for drug dealers to cut-off the ends of plastic baggies in order to package small amount of narcotic s to be sold to customers. Further, during the weeks of physical and electronic surveillance of REYNOLDS, investigators have never followed him to, nor witnessed him attend, any employment. Therefore, investigators believe the multiple receipts located during the trash pulls that showed abnormally large cash purchases may have been purchased with drug proceeds.

28.     During the week of March 9, 2020, investigators maintained both physical and electronic surveillance of the Kingsley address. On March 14, 2020, TFO Weissenborn observed that a LPR reader had captured the Jeep Cherokee at 9:49 AM in Cleveland, Texas headed in a northerly direction. At approximately 11:08 PM, TFO Weissenborn observed a light colored SUV, strongly resembling the Jeep Cherokee, arrive at the Kingsley address and pull into the driveway. TFO Weissenborn observed what he believed to be a black male subject walking towards the driver's door and pull the vehicle into the garage. Investigators immediately established both physical and electronic surveillance of the residence.

29.     On March 15, 2020, investigators observed REYNOLDS leave the residence empty handed on multiple occasions and return with one or more white bags a short time later. Based on training and experience and the experience of the investigative team, investigators believed that Reynolds was collecting drug proceeds owed to the WILSON DTO. At approximately 2:15 PM, investigators observed a black colored Lincoln MKZ, bearing Missouri License VA4-G5U, arrive

at 3315 Kingsley.  The Lincoln MKZ is registered to Krisie L. Aikens at 71 Charbonier Bluffs, which is the known address of Ali WILSON.  Investigators believe Aikens is the live-in girlfriend of Ali WILSON.

30.     A black male subject, strongly resembling Ali WILSON, exited the Lincoln MKZ and entered the Kingsley residence empty handed.  At approximately 2:50 PM, the same subject exited the residence carrying two black colored duffle bags with REYNOLDS following. Investigators announced their presence and instructed Ali WILSON and REYNOLDS to obey their commands by showing their hands.  Ali WILSON placed the two duffle bags he was carrying into the rear seat of the Lincoln MKZ before surrendering without incident.

31.     That day, investigators obtained federal search warrants for the Kingsley residence and three vehicles (one of which included the duffle bags carried by WILSON) at the residence. Investigators executed the search warrants and located approximately 25 kilograms of suspected cocaine inside the duffle bags WILSON placed in the Lincoln MKZ.  The Jeep Cherokee contained an after-market "trap" used to transport drugs and U.S. currency.  Suspected heroin, marijuana, miscellaneous documents, a handgun (with serial number scratched off), a digital scale with white residue, nine cellular phones, a money counter previously introduced to the DTO, and other items indicating drug trafficking were located within the residence.

**WILSON's Link to Erica HOUSTON**

32.     After the arrest of WILSON on March 16, 2020, investigators conducted a series of "drive-by's" on several suspected WILSON DTO stash houses in an attempt to see if any contraband and/or U.S. currency would be moved.  On March 17, 2020, investigators drove by 302 Wilmer Farms Trail, to discover that Erica HOUSTON and Boyd HOUSTON were at the residence.

11

33.     Investigators previously identified the residence at 302 Wilmer Farms as a possible stash house. On August 23, 2019, investigators monitored the PLW of WILSON and observed him depart St. Louis, Missouri and travel to Milwaukee, Wisconsin. Investigators continued to monitor the PLW information to discover that WILSON's cellular device appeared to stop at a Double Tree Marriott hotel in downtown Milwaukee at approximately 8:30 pm. Investigators contacted DEA investigators in Milwaukee and requested they conduct surveillance on WILSON. Investigators from DEA Milwaukee were able to locate WILSON at the Double Tree hotel at approximately 8:30 am as he entered a 2019 Dodge Ram truck, bearing Missouri license place 1HCG86. Investigators utilized a law enforcement database to discover WILSON had rented the vehicle from Hertz Rental Car. Investigators received information from the CS that he/she believed WILSON traveled to Milwaukee to oversee the shipment of approximately 20 kilograms of cocaine to a subject known to the CS only as "Abdullah."

34.     WILSON departed Milwaukee approximately 12 hours after arriving and traveled straight to 302 Wilmer Farms Trail, Wentzville, MO 63385. Investigators conducted numerous days of surveillance on 302 Wilmer Farms Trail and believed it to be vacant based on the lack of activity at the residence. Further, investigators contacted several neighboring residents who stated that they believed 302 Wilmer Farms Trail was a drug house based on the long periods of no activity followed by a brief stint of high vehicular volume approximately every thirty days.

35.     Accordingly, when observed on March 17, investigators believed that Erica HOUSTON and Boyd HOUSTON were attempting to empty the suspected stash house at 302 Wilmer Farms.

**CS Information on WILSON'S Use of Stash Locations**

36.     Along with the information about Milwaukee, the CS stated that historically, WILSON utilized a third party or co-conspirator to rent a storage locker and/or stash house to store large amounts of narcotics and/or U.S. currency.  As mentioned above, the CS was a former member and heroin source of supply for the WILSON DTO.  The CS stated that both Yusuf and Ali WILSON utilize a network of purchased real estate properties to both store large amounts of narcotics and launder drug proceeds.  The CS added that Ali and Yusuf WILSON usually use the names of family members to hide investment properties and other assets from law enforcement. Based on information provided by the CS, investigators discovered that Yusuf WILSON owned a property management company in Houston, Texas and Phoenix, Arizona.  Additionally, Yusuf WILSON resided in a Conroe, Texas residence, valued at approximately $1.2 million dollars, that was in his mother, Carolyn Abernathy's, name.  It should be noted, that according to public records, Yusuf WILSON's home appears to be paid off with no lien.  Further, investigators discovered that Ali WILSON had purchased six St. Louis area homes, most with cash.  On March 19, 2019, Ali WILSON quit claimed all six properties into his sister, Karima WILSON's name. However, all utilities remained in Ali WILSON's name.

37.     Based on training and experience, what the CS described is common for large-scale drug dealers.  They typically launder money through the purchase of investment properties.  Also, it is common for drug dealers to utilize family members or co-conspirators as straw purchaser to attempt to hide assets from the potential seizure by law enforcement.

**Further Investigation of Target Location #1 & Identification of Target Location #2**

*Paragraph Withdrawn 3/24/2020 SLC NAB*

~~38.     Investigators believed that the WILSON DTO utilized Target Location #1 to store bulk narcotics and/or US currency based on the investigation to date, physical and electronic surveillance and CS information, to include GPS and PLW information from WILSON's cellular~~

13

~~device and vehicle directly before making several large cash deposits at multiple banks,~~
~~information provided by the CS about the operations of the WILSON DTO, including storage~~
~~locker units, and historical information in which investigators believe that Ali WISLON provided~~
~~$553,000 in US currency for an undetermined amount of narcotics upon delivery.~~

39.     Based on training and experience, investigators believe that it is common for DTO's to urgently change stash house locations when a member with knowledge of those locations has been arrested in an attempt to safeguard against the arrested individuals potential cooperation with law enforcement.  After the arrest of Ali WILSON in possession of a large amount of cocaine, the lack of U.S. currency discovered at the time of his arrest, and the intelligence gathered by the investigation to date, investigators surmised that the WILSON DTO utilized a series of storage lockers to store bulk narcotics and/or US currency.  Due to the proximity of **Target Location #1** to the location where WILSON was arrested with the large amount of cocaine (approximately 6 miles), investigators subpoenaed Public Storage at 6030 North Lindbergh Boulevard.  Knowing that members hide assets, as well as the recent trip WILSON had to panama with multiple WILSON DTO cell heads (to include Erica HOUSTON) to meet a Panamanian narcotics supplier, investigators subpoenaed the names of the identified WILSON DTO cell heads and facilitators, to include BROWN and Erica HOUSTON. Positive responses were obtained for WILSON's main courier and head of security (BROWN) at **Target Location #1** and WILSON DTO facilitator and subject observed at WILSON's suspected stash house the day after his arrest (Erica HOUSTON) at **Target Location #2**.

40.     Investigators travelled to the Public Storage office at 6030 North Lindbergh Blvd. and made contact with the facility manager.  The manager informed investigators that BROWN rents **Target Location #1**; however, in addition to BROWN, he has also seen two other men at

14

**Target Location #1** on several occasions. Investigators provided the manager with multiple photographs of WILSON DTO members. The manager positively identified Ali WILSON and Earl WRIGHT as the men he had seen at **Target Location #1**. The manager further stated that WILSON and WRIGHT would arrive alone and would not be accompanied by BROWN, as recently as February of 2020.

41.    WRIGHT is a prominent member of the WILSON DTO. Previously, the CS told investigators that Yusuf and Ali WILSON supply Earl WRIGHT large amounts of fentanyl, heroin, cocaine, methamphetamine and marijuana. Further, on July 31, 2019, the CS met with WRIGHT and another where WRIGHT was recorded discussing terms for the purchase of heroin and cocaine from the CS. WRIGHT was interested in purchasing kilogram quantities of cocaine and heroin. It should be noted that the money counter recovered inside Marvell REYNOLDS' Kingsley residence was originally sold to WRIGHT and another WILSON DTO member by the CS at the DEA's direction.

42.    The manager informed investigators that BROWN pays the rent for **Target Location #1** monthly in cash and most recently paid on March 5, 2020. The manager also stated that the gate code specific to **Target Location #1** had not been used since October 2019; however, the manager stated that due to the high volume of traffic at the facility, it is not uncommon for subjects to enter the already open gate and bypass the use of a locker specific code.

43.    Investigators utilized St. Louis Metropolitan Police Department Canine officer David Wilson, DSN 7893, and his canine partner, "Nico." Nico is a trained and certified drug detecting canine. Nico conducted an open-air sniff of the outside of **Target Location #1** and immediately alerted to an odor of narcotics. Officer Wilson provided Nico with an approximate

15

five minute break and then conducted a second open-air sniff of **Target Location #1**, resulting in a second immediate positive alert for the odor of narcotics.

**Investigation of Target Location #2**

44.      Investigators, Officer Wilson, and "Nico" then travelled to **Target Location #2**. In order to reach **Target Location #2** (an interior storage unit), Nico had to walk down a long hallway of storage unit doors.  Proceeding down the long hallway past these doors, Nico did not alert. However, upon entering the vicinity of **Target Location #2**, Nico immediately ran to the door of **Target Location #2** and alerted.  Investigators obtained the payment information for **Target Location #2** to discover that Erica HOUSTON had paid for the unit with a credit card in her name. The last payment was made for the month of March 2020.

## BACKGROUND REGARDING DRUG TRAFFICKING ACTIVITIES

45.      Based on training and experience, investigators know that it is common for high-level drug traffickers to utilize a storage locker that is rented in a third party name to avoid detection by law enforcement.  It is also common for drug traffickers to pay in case or reimburse the third party for the expense of the storage locker in order to avoid detection.

46.      Based on my training and experience and that of the investigative team, I know the following:

a.  Drug traffickers often store documents and other items relating to the possession, manufacture, importation, exportation, and distribution of drugs and to the illegal proceeds of drug trafficking in their residences, stash houses, and cars where they are readily available and concealed from law enforcement.  These documents and items include invoices, shipping labels, tracking numbers, boxes, and envelopes.

b.  Drug traffickers commonly store drugs and drug paraphernalia, including packaging materials, cutting agents, and manufacturing tools, in their residences, stash houses, and cars where they are readily available and concealed from law enforcement.

c.  Drug traffickers keep books, receipts, notes, ledgers, and other records relating to their drug distribution activities.  Because drug traffickers often "front" drugs to their customers - that is, sell the drugs on credit - or receive drugs from their suppliers on credit, such records are necessary to keep track of the amounts paid and owed by/to their customers and suppliers.  These ledgers are more commonly known as "pay/owe sheets," and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets.  "Pay/owe sheets" are frequently encoded in order to protect the identities of customers and suppliers.  Drug traffickers often keep such records in their residences, stash houses, and cars.  Such records are often stored electronically within the memory of telephones, computers, and personal digital assistants such as iPhone and Blackberry devices, which drug dealers often keep in their residences, stash houses, and cars.

d.  Drug traffickers commonly keep large sums of currency, financial instruments, precious metals, jewelry, gift cards, and other items of value, which are either the proceeds from drug sales or are intended for the purchase of drugs.  When drug traffickers amass such wealth, they often attempt to conceal it and its origin from discovery by law enforcement.  Drug traffickers use many different techniques to do so, including using digital currency, and using savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source.  Drug traffickers also use drug proceeds to purchase real estate or cars, and establish shell corporations and business fronts that they use to launder drug proceeds.  Drug traffickers often use fictitious or "straw-holder" owners

to conceal the true ownership of real estate, cars, or other valuable items purchased with the proceeds of drug sales. In addition, drug traffickers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution activities. Drug traffickers often keep these items of value, and records relating to them, in their residences, stash houses, and cars where they are readily available and concealed from law enforcement. Records related to such items are often stored electronically within the memory of telephones, computers, and personal digital assistants such as iPhone and Blackberry devices, which drug dealers often keep in their residences, stash houses, and cars.

e. Drug traffickers go to great lengths to hide and secure the drugs, drug proceeds, other items of value, and records relating to their drug business. This is to safeguard those items against robbery and keep them hidden from law enforcement. Drug traffickers hide these items by storing them in secure locations, including safes, vaults, or other locked containers, as well as in specially-constructed concealed compartments that are often found in cars used for drug trafficking. Other methods of concealment include the burial of items underground, the use of locked cars, trailers, out buildings, sheds, and exterior closets, the use of natural spaces within walls, furniture, cars, and other areas, and the use of sealed cans and canning machines.

f. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. These records are typically maintained in their residences, stash houses, and cars, where they are readily

available and concealed from law enforcement. Moreover, such records are often stored electronically within the memory of telephones, computers, and personal digital assistants such as iPhone and Blackberry devices, which drug dealers often keep in their residences, stash houses, and cars.

g. Drug traffickers frequently possess firearms, ammunition, silencers, explosives, incendiary devices, and other dangerous weapons to protect their profits and supply of drugs from others who might attempt to forcibly take such items and harm the drug traffickers during transactions. Such weapons, which are often stolen or otherwise possessed illegally, are typically kept in their residences, stash houses, and cars where they are concealed from law enforcement and readily available.

h. Drug traffickers often use two way radios, police scanners, video surveillance systems, and other counter surveillance equipment to prevent detection by law enforcement. Such items are typically kept in their residences, stash houses, and cars.

i. Drug traffickers frequently take, or cause to be taken, photographs and videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs. Such items are often stored in their residences and cars, and on digital devices.

j. Drug traffickers often use electronic devices such as cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and personal digital assistants such as iPhone and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. Drug traffickers often keep the documents and records described above on those devices. Drug traffickers often use multiple phones, including not only their own phones but also phones of family members and significant

others, in order to avoid detection by law enforcement. Drug traffickers often keep these devices in their residences, stash houses, and cars where they are readily available.

## CONCLUSION

47.     Based on training, experience, and the investigation to date, investigators believe that various WILSON DTO members utilize **Target Location #1** and **Target Location #2** to store bulk narcotics and/or U.S. currency.

48.     Thus, I believe that evidence, fruits, and instrumentalities of violations of Title 21, United States Code Sections 841 and 846 and Title 18, United States Code Sections 1956 and 1957, to include controlled substances, documents, and proceeds, will be found at **Target Location #1** and **Target Location #2**.

49.     In view of the ongoing nature of the investigation, and the risk of harm to informants, cooperating witnesses, to agents, and to the investigation, which would exist should the information in this affidavit be prematurely disclosed, I respectfully request that this affidavit and associated records concerning this search be sealed until further order of the Court.

Respectfully submitted,

Jason Dietl
Task Force Officer – DEA

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedures 4.1 and 41 on this ___24__ day of March, 2020.

Nannette A. Baker
United States Magistrate Judge

20

**Attachment A**
**Target Location #1**



**Attachment A**
**Target Location #2**



**Attachment B**

*Property to be seized*

All records and information relating violations of Title 18, United States Code, Sections 1956 and 1957, and Title 21, United States Code, Sections 841(a) and 846, that constitutes fruits, evidence and instrumentalities of violations including:

1.   Controlled substances;

2.   Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including, but not limited to, scales, baggies and spoons;

3.   Books, records, receipts, notes, ledgers, computer hard-drives and disk records, and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances and/or firearms;

4.   Telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service;

5.   Digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room and/or digital communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association with persons known to traffic in controlled substances or to facilitate such trafficking;

6.   Photographs, in particular photographs of co-conspirators, assets and/or controlled substances;

7.   United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances;

8.   Books, records, receipts, pay stubs, employment records, bank statements and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

9.   Papers, tickets, notes, schedules, receipts and other items relating to travel, including, but not limited to, travel to and from St. Louis, Missouri and elsewhere; and

10.   Indicia of occupancy, residency, rental and/or ownership of the vehicles and/or premises described above, including, but not limited to, utility and telephone bills, cancelled envelopes, rental or lease agreements and keys.

23